ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7038

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

BLASKET RENEWABLE INVESTMENTS, LLC,

*Petitioner-Appellant*,

v.

THE KINGDOM OF SPAIN,

*Respondent-Appellee*.

---

Appeal from the United States District Court for
the District of Columbia
No. 1:21-cv-03249-RJL, Hon. Richard J. Leon

---

## APPELLANT'S FINAL OPENING BRIEF

---

Matthew D. McGill
Matthew S. Rozen
Jeffrey Liu
Lavi M. Ben Dor*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 887-3680
MMcGill@gibsondunn.com

*Attorneys for Blasket Renewable
Investments, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), appellant certifies the following:

**(a) Parties and *Amici*.**  Blasket Renewable Investments LLC ("Blasket") was the petitioner in the district court and is the appellant in this Court.  Blasket was substituted as petitioner for AES Solar Energy Coöperatief U.A. and Ampere Equity Fund B.V., which were previously petitioners in the district court.  The Kingdom of Spain ("Spain") was the respondent in the district court and is the appellee in this Court.  The European Commission appeared in the district court as an *amicus curiae* in support of Spain.

**(b) Rulings Under Review.**  This action challenges the March 29, 2023 order and opinion of the district court granting Spain's motion to dismiss Blasket's petition to enforce an arbitral award and denying Blasket's motion for a temporary restraining order and preliminary injunction.  Memorandum Opinion, *Blasket Renewable Investments LLC v. Kingdom of Spain*, No. 1:21-cv-3249 (D.D.C. Mar. 29, 2023) (Leon, J.), Dkt. 44, JA833-52; Order, Dkt. 45, JA853.  The district court's opinion does not yet have a Federal Reporter citation, but it is publicly available at 2023 WL 2682013.

**(c) Related Cases.**  This case is related to the appeals before this Court in *NextEra Energy Global Holdings B.V., et al. v. Kingdom of Spain*, No. 23-7031, and *9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 23-7032.

## RULE 26.1 DISCLOSURE STATEMENT

Blasket is a Delaware limited-liability company.  Trinity Investments DAC, an Irish designated activity company, is the sole managing member of Blasket and owns 60% of its equity.  Blasket Investments DAC, an Irish designated activity company, owns the remaining 40% of Blasket's equity.  No publicly held corporation owns more than 10% of Blasket.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 DISCLOSURE STATEMENT............................................................ ii

TABLE OF AUTHORITIES ..................................................................... v

GLOSSARY ..................................................................................... xii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 5

STATEMENT OF ISSUES ................................................................. 5

STATUTES AND REGULATIONS..................................................... 5

STATEMENT OF THE CASE.............................................................. 5

    I.    Spain Induces Claimants' Investment In Its Territory Then
           Retrenches On Its Incentives ............................................... 5

    II.   Claimants' Investments Are Protected By The Energy Charter
           Treaty And The New York Convention ............................... 6

    III.  The Arbitral Tribunal Rejects Spain's Objections To Intra-EU
           Arbitration And Awards Claimants Relief......................... 8

    IV.  Spain Seeks To Evade Enforcement Of The Award......................... 10

    V.   The District Court's Ruling And This Appeal.................................. 13

SUMMARY OF ARGUMENT ............................................................. 14

STANDARD OF REVIEW ................................................................... 16

ARGUMENT...................................................................................... 16

I.    The District Court Erred By Dismissing For Lack Of Subject-Matter Jurisdiction Under The Foreign Sovereign Immunities Act ....................................................................................... 16

    A.    The District Court Has Jurisdiction Under The FSIA's Arbitration Exception ............................................................. 18

        1.    Spain Cannot Relitigate The Tribunals' Jurisdiction Under The Arbitration Exception ..................................... 18

        2.    The Tribunal's Determination That Spain Consented To Arbitration Was Correct ............................................ 30

            a.    The ECT Unambiguously Authorizes Intra-EU Arbitration ..................................................... 31

            b.    The EU Treaties Cannot Deprive The ECT Of Force Under International Law ...................... 37

    B.    The District Court Has Jurisdiction Under The FSIA's Waiver Exception .................................................... 43

II.    Blasket Is Entitled To An Anti-Anti-Suit Injunction ........................ 48

CONCLUSION .................................................................................. 52

CERTIFICATE OF SERVICE ............................................................. 53

CERTIFICATE OF COMPLIANCE ..................................................... 54

ADDENDUM OF AUTHORITIES

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*9REN Holding S.À.R.L. v. Kingdom of Spain*,
  2023 WL 2016933 (D.D.C. Feb. 15, 2023) ................................................24, 49

*Abur v. Republic of Sudan*,
  437 F. Supp. 2d 166 (D.D.C. 2006) ...................................................................45

*Amirmotazedi v. Viacom, Inc.*,
  768 F. Supp. 2d 256 (D.D.C. 2011) ...................................................................29

*Donovan ex rel. Anderson v. Stafford Constr. Co.*,
  732 F.2d 954 (D.C. Cir. 1984) ...........................................................................51

*Ashraf-Hassan v. Embassy of France in U.S.*,
  40 F. Supp. 3d 94 (D.D.C. 2014) ................................................................45, 48

*Bates v. United States*,
  522 U.S. 23 (1997) .............................................................................................20

*Beijing Shougang Mining Inv. Co. v. Mongolia*,
  11 F.4th 144 (2d Cir. 2021) ...............................................................................17

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
  668 F.3d 724 (D.C. Cir. 2012) ......................................................................2, 17

*Belize Telecom, Ltd. v. Gov't of Belize*,
  528 F.3d 1298 (11th Cir. 2008) .........................................................................45

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
  735 F.3d 72 (2d Cir. 2013) ...........................................................................44, 46

*Cabiri v. Gov't of Republic of Ghana*,
  165 F.3d 193 (2d Cir. 1999) ..............................................................................43

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
  148 F.3d 1080 (D.C. Cir. 1998) .........................................................................51

*Chevron Corp. v. Ecuador*,
  795 F.3d 200 (D.C. Cir. 2015)....................................................19, 22, 23, 24, 29

*Chevron Corp. v. Republic of Ecuador*,
  949 F. Supp. 2d 57, 64 (D.D.C. 2013).............................................................23

*Chiejina v. Fed. Republic of Nigeria*,
  2022 WL 3646377 (D.D.C. Aug. 24, 2022) ................................................23, 24

*Comm'ns Workers of Am. v. AT&T Inc.*,
  6 F.4th 1344 (D.C. Cir. 2021)........................................................................26

*ConocoPhillips Petrozuata B.V. v. Bolivarian Republic of Venezuela*,
  2022 WL 3576193 (D.D.C. Aug. 19, 2022) ................................................44, 46

*Creighton Ltd. v. Gov't of State of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999)........................................................21, 43, 44, 46, 47

*Cube Infrastructure Fund SICAV v. Kingdom of Spain*,
  2023 WL 2914472 (D.D.C. Mar. 31, 2023).......................................................24

*E. Airlines, Inc. v. Floyd*,
  499 U.S. 530 (1991).......................................................................................32

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
  844 F.3d 281 (D.C. Cir. 2016).........................................................................17

*First Options of Chi. Inc. v. Kaplan*,
  514 U.S. 938 (1995).......................................................................................25

*Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016).........................................................................49

*HCSC-Laundry v. United States*,
  450 U.S. 1 (1981)...........................................................................................40

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019)............................................................................24, 25, 28

*Johansson v. Central Properties, LLC*,
  320 F. Supp. 3d 218 (D.D.C. 2018)..................................................................28

*Jones Dairy Farm v. Loc. No. P-1236, United Food & Com. Workers Int'l Union, AFL-CIO*,
760 F.2d 173 (7th Cir. 1985) ............................................................27

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
335 F.3d 357 (5th Cir. 2003) ............................................................21

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
500 F.3d 111 (2d Cir. 2007) ............................................................51

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984)........................................12, 49, 50, 51

*LLC SPC Stileks v. Republic of Moldova*,
985 F.3d 871 (D.C. Cir. 2021)..........................2, 3, 18, 19, 23, 26, 27, 29, 30

*Made in the USA Found. v. United States*,
242 F.3d 1300 (11th Cir. 2001) ........................................................38

*Medellin v. Texas*,
552 U.S. 491 (2008)........................................................................38

*Mgmt. & Tech. Consultants S.A. v. Parsons-Jurden Int'l Corp.*,
820 F.2d 1531 (9th Cir. 1987) ....................................................8, 17

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)........................................................16

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)........................................................................51

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
2023 WL 2016932 (D.D.C. Feb. 15, 2023) ................................24, 49

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
724 F.3d 230 (D.C. Cir. 2013)....................................................21, 41

*Oxford Health Plans LLC v. Sutter*,
569 U.S. 564 (2013)..................................................................25, 28

*Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.*,
   291 U.S. 138 (1934)........................................................................38

*Polimaster Ltd. v. RAE Sys., Inc.*,
   623 F.3d 832 (9th Cir. 2010) ......................................................17

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
   27 F.4th 771 (D.C. Cir. 2022)........................................16, 20, 21, 47

*RDP Technologies, Inc. v. Cambi AS*,
   800 F. Supp. 2d 127 (D.D.C. 2011)................................................29

*Rent-A-Center, W., Inc. v. Jackson*,
   561 U.S. 63 (2010).................................................................25, 26

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)....................................................................17

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,
   Kommanditgesellschaft v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993) .....................................................44, 48

*Stati v. Republic of Kazakhstan*,
   199 F. Supp. 3d 179 (D.D.C. 2016)................................................44

*Sumitomo Shoji Am., Inc. v. Avagliano*,
   457 U.S. 176 (1982)....................................................................36

*Tatneft v. Ukraine*,
   771 F. App'x 9 (D.C. Cir. 2019) (per curiam) ..............................4, 44

*Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*,
   590 F. Supp. 3d 262 (D.D.C. 2022)............................................23, 24

*United States v. Ali*,
   718 F.3d 929 (D.C. Cir. 2013).....................................................32

*United States v. Martinez*,
   755 F. Supp. 1031 (N.D. Ga. 1991)................................................39

**Statutes**

9 U.S.C. §§ 201-208 ................................................................11, 45

9 U.S.C. § 201................................................................................1

9 U.S.C. § 207............................................................................2, 17

28 U.S.C. § 1291............................................................................5

28 U.S.C. § 1330(a) ....................................................................5, 18

28 U.S.C. § 1605(a)(1)......................................3, 5, 13, 14, 18, 43, 48

28 U.S.C. § 1605(a)(6)..................................2, 5, 13, 14, 18, 19, 20, 22

**Treaties**

ECT, art. 1......................................................................................6, 32

ECT, art. 2......................................................................................6

ECT, art. 10....................................................................................6, 7

ECT, art. 16....................................................................................40, 41

ECT, art. 26........................................................3, 7, 26, 32, 34, 35, 36

ECT, art. 40....................................................................................7

ECT, art. 42....................................................................................36, 37

ECT, art. 47....................................................................................37

ICSID Convention, art. 37 ................................................................30

New York Convention, art. I..............................................................8

New York Convention, art. III............................................1, 8, 10, 17, 45

New York Convention, art. V..........................................2, 3, 8, 10, 21, 22

TFEU, art. 258................................................................................39

TFEU, art. 267................................................................................39, 41

TFEU, art. 344 ...................................................................................41

UNCITRAL Rules, art. 9.....................................................................30

UNCITRAL Rules, art. 23 ..........................................................7, 26, 29

Vienna Convention, art. 6 .................................................................37

Vienna Convention, art. 26 ..........................................................37, 38

Vienna Convention, art. 27 ..........................................................38, 39

Vienna Convention, art. 30 ..........................................................40, 41

Vienna Convention, art. 31 .................................................................37

Vienna Convention, art. 41 .................................................................38

Vienna Convention, art. 46 ..........................................................38, 39

**Foreign Judicial and Arbitral Decisions**

*Blusun S.A. v. Italian Republic*, ICSID Case No. ARB/14/3, Award
(Dec. 27, 2016), bit.ly/3waaYKc ....................................................39

*Hydro Energy 1 S.á.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/42,
Decision on Jurisdiction, Liability and Directions on Quantum
(Mar. 9, 2020), bit.ly/3IxnAAn..................................................35, 41

*Green Power Partners K/S & SCE SolarDon Benito APS v. Kingdom of Spain*,
SCC Arbitration V (2016/135) (June 16, 2022), bit.ly/3N4SrXA ....................31

*Infrastructure Servs. Luxembourg S.À.R.L. v. Kingdom of Spain*,
[2023] EWHC 1226 (Comm), bit.ly/45wjoL2............................................31, 42

*Matthews v. United Kingdom*,
28 Eur. Ct. H.R. 361 (Feb. 18, 1999), bit.ly/3MSCbbX ...................................42

*Republic of Moldova v. Komstroy LLC*,
ECLI:EU:C:2021:655 (Sept. 2, 2021), bit.ly/3MJaiSn...........................9, 28, 41

*Slovak Republic v. Achmea BV*, ECLI:EU:C:2018:158
(Mar. 6, 2018), bit.ly/42gP0l9 ...........................................................9

*Vattenfall AB v. Fed. Republic of Germany*, ICSID Case No. ARB/12/12,
Decision on *Achmea* Issue (Aug. 31, 2018), bit.ly/3Kqecxo ......................33, 41

**Other Authorities**

Br. for Appellant, *Tatneft v. Ukraine*, 2018 WL 4215736 (D.C. Cir.
Sept. 4, 2018)......................................................................................47

Draft Treaty, Basic Agreement for the European Energy Charter
(Aug. 12, 1992), bit.ly/3ia5E0Z........................................................33

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604............45, 48

Restatement (Fourth) of Foreign Relations Law: Treaties, Tentative
Draft No. 2 § 102, Reporter's Note 6 (Mar. 20, 2017) .....................38

Treaty Establishing the European Economic Community,
bit.ly/3xie8Mq ...................................................................................41

Brief of the United States as *Amicus Curiae*, *Process & Indus. Devs.
Ltd. v. Fed. Republic of Nigeria*, 2022 WL 190972 (D.C. Cir. Jan.
20, 2022)......................................................................................20, 21

UN Int'l Law Comm'n Rep't on Fragmentation of Int'l Law
(Apr. 13, 2006), bit.ly/3IikAVj.........................................................33

## GLOSSARY

| | |
|---|---|
| CJEU | Court of Justice of the European Union |
| ECT | Energy Charter Treaty |
| EU | European Union |
| FAA | Federal Arbitration Act |
| FSIA | Foreign Sovereign Immunities Act |
| ICSID | International Center for Settlement of Investment Disputes |
| TFEU | Treaty on the Functioning of the European Union |
| UNCITRAL | United Nations Commission on International Trade Law |

# INTRODUCTION

Appellant Blasket Renewable Investments LLC ("Blasket") is one of several parties seeking to enforce arbitral awards obtained under the Energy Charter Treaty ("ECT") against the Kingdom of Spain ("Spain"). Blasket's award (the "Award," JA20-333) is indisputably final, as the highest court in the country where arbitration was seated—the Swiss Federal Supreme Court—has dismissed Spain's application to set aside the Award. But Spain still refuses to pay. Blasket's predecessors in interest thus brought this action under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 ("New York Convention") seeking recognition and enforcement of the Award.

The New York Convention is a treaty signed by the United States, Spain, and most nations of the world that obliges signatories to recognize and enforce international arbitral awards subject only to the limited defenses provided in the Convention itself. The United States therefore has a treaty obligation to "recognize arbitral awards" governed by the Convention "as binding and enforce them." New York Convention, art. III. Congress accordingly has mandated that the New York Convention "shall be enforced in United States courts." 9 U.S.C. § 201. And Chapter 2 of the Federal Arbitration Act ("FAA")—which implements the Convention in the United States—directs courts to "confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified

in the said Convention." *Id.* § 207.  Those grounds are exceptionally limited.  *See* New York Convention, art. V.  The FAA thus "affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012).

The district court, however, reached the surprising and virtually unprecedented conclusion that there was no subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") to entertain this action to confirm Blasket's Award as contemplated by the Convention.  That conclusion should be reversed on either or both of two independent grounds.

*First*, the FSIA's arbitration exception abrogates a foreign state's immunity when the action is "to confirm an award made pursuant to … an agreement to arbitrate."  28 U.S.C. § 1605(a)(6).  This is such an action.  The district court, however, accepted Spain's argument that its accession to the ECT in 1998 provided no "agreement to arbitrate" with Blasket's predecessors-in-interest because the Court of Justice for the European Union ("CJEU") held decades later that the laws of the European Union ("EU") do not permit an EU member state to agree to arbitrate disputes with an investor residing in the EU ("intra-EU" arbitration).  The district court's conclusion runs headlong into this Court's holding in *LLC SPC Stileks v. Republic of Moldova* that "arbitrability of a dispute is not a jurisdictional question under the FSIA."  985 F.3d 871, 878 (D.C. Cir. 2021).  Instead, whether an arbitral tribunal

2

had jurisdiction to decide a "particular dispute" goes to the *merits* of the confirmation petition under Article V of the Convention. *Id.*

*Stileks* points also to a further fatal error in the district court's analysis. *Stileks* held that the ECT's arbitration clause delegates disputes over arbitrability to the arbitral tribunal. 985 F.3d at 878-79. This Court accordingly "must accept the arbitral tribunal's determination that [the] claim [at issue here] fell within the ECT." *Id.* at 879. The district court erred in concluding it could review *vel non* Spain's contention that it had not agreed to arbitrate this dispute.

Finally, when the district court conducted its own international-law analysis, it skidded badly off the rails. The district court read the ECT's directive that tribunals "decide the issues in dispute in accordance with … international law," ECT, art. 26(6), as subordinating the ECT to the EU treaties underlying Spain's intra-EU objection. That interpretation is wrong as a textual matter, nullifies the ECT's drafters' decision not to exclude intra-EU disputes, and end-runs the ECT's amendment process. Of the dozens of arbitral tribunals outside the EU to have considered Spain's intra-EU objection, none has adopted the district court's wayward reading of the ECT. This Court should not let it stand. The FSIA's arbitration exception provides subject matter jurisdiction over Blasket's petition to confirm its arbitral award.

*Second*, the district court also had jurisdiction under the FSIA's implied waiver exception, 28 U.S.C. § 1605(a)(1), because Spain "waive[d] its immunity

3

from arbitration-enforcement actions in other signatory states" by "sign[ing] the [New York] Convention." *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam). The district court erred in holding that Spain's waiver of immunity is applicable only if there is a valid agreement to arbitrate. That holding conflates federal-court subject-matter jurisdiction—which is established by Spain's accession to the New York Convention—with the merits, which can consider whether the arbitral tribunal had jurisdiction to decide the dispute before it. Spain's waiver of immunity stands as an independent basis for reversal.

Upon reversing, this Court should also instruct the district court to grant Blasket's motion for a preliminary injunction. Spain is currently pursuing injunctive relief in the Dutch courts to undermine the district court's jurisdiction by enjoining Blasket from proceeding with this lawsuit. In *NextEra* and *9REN*, the district court entered an anti-anti-suit injunction enjoining Spain from pursuing similar actions in the EU courts. Blasket sought the same relief, but the district court denied it as moot based on its erroneous holding that it lacked jurisdiction. If the Court affirms the injunctions in *NextEra* and *9REN*, there will be no basis for the district court to deny Blasket the same injunction. Rather than remanding for further proceedings, therefore, the Court should simply instruct the district court to grant relief.

This Court should therefore reverse the dismissal of this action and remand with instructions for the district court to enter an anti-anti-suit injunction.

## JURISDICTIONAL STATEMENT

As explained *infra* at 16-48, the district court had subject-matter jurisdiction under the FSIA, 28 U.S.C. §§ 1330(a) and 1605(a)(1), (6).  The court entered final judgment on March 29, 2023.  JA853.  Blasket timely appealed.  JA854.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Did the district court err in dismissing this action for lack of subject-matter jurisdiction after finding that neither the FSIA's arbitration exception nor its waiver exception applied to this action under the New York Convention to confirm an international arbitration award?

2.     Did the district court err in denying Blasket's motion for a preliminary injunction to prevent Spain from obtaining an anti-suit injunction in Dutch court that would enjoin Blasket from proceeding with this litigation?

## STATUTES AND REGULATIONS

Pertinent statutes, regulations, and treaties are reproduced in the addendum.

## STATEMENT OF THE CASE

### I.     Spain Induces Claimants' Investment In Its Territory Then Retrenches On Its Investment Incentives

Claimants AES and Ampere—Blasket's predecessors in interest—are Dutch companies that invested billions of Euros in solar energy installations in Spain in reliance on financial incentives and inducements that Spain enacted to promote the

development of renewable energy. JA75, 77-79, 84, 343. Spain's assurances that the incentives were "'immutab[le]'" and could not be withdrawn induced Claimants' investments. JA79. And Spain reaped the benefits: The influx of foreign investment jump-started its renewable energy sector, enabling it to compete with conventional energy sources. JA75-76, 83.

Spain's favorable treatment of renewable energy investments was short lived. Between 2010 and 2014, Spain adopted a series of measures retrenching on, and eventually revoking, the incentives on which Claimants had relied, depriving them of the rate of return that Spain "guarantee[d]" and costing them millions of Euros in promised returns. JA80-84, 222, 275, 285-86.

## II. Claimants' Investments Are Protected By The Energy Charter Treaty And The New York Convention

Claimants' investments in Spain were protected by two international treaties: the Energy Charter Treaty and the New York Convention.

The ECT is a multilateral investment treaty adopted in 1998 among 53 nations and regional organizations to "establis[h] a legal framework [for] promot[ing] long-term cooperation in the energy field." ECT, art. 2. Its contracting parties include the EU, every EU member except Italy (which withdrew in 2016), and 26 nations outside the EU. The ECT protects investments in the territory of a "Contracting Party" to the treaty (*e.g.*, Spain) by "Investors" (*e.g.*, Claimants) located or incorporated in "other Contracting Parties" (*e.g.*, the Netherlands). ECT, arts. 1(7), 10(1),

26, 40(2).  As relevant here, Contracting Parties agree to "accord … fair and equitable treatment" to the investments of other Contracting Parties' investors.  *Id*., art. 10(1).

To give those protections force, the ECT's contracting parties "unconditional[ly] consent" to the submission of investment disputes arising under the treaty to "international arbitration" at the investor's election.  ECT, art. 26(2), (3)(a).  Investors can choose among several arbitration formats, including the option Claimants selected here—an "ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law" ("UNCITRAL Rules").  ECT, art. 26(1), (4)(b).

The UNCITRAL Rules provide comprehensive procedural rules for arbitration.  Article 23 of those Rules empowers an arbitral tribunal "to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement."  UNCITRAL Rules, art. 23(1).  The UNCITRAL Rules thus ensure that any questions about the parties' consent to arbitration are settled by arbitrators well in advance of any litigation to enforce any resulting arbitral award.

To provide streamlined enforcement of awards resolving disputes under the ECT, the ECT permits "any party to the dispute" to insist that arbitration take place "in a state that is a party to the New York Convention."  ECT, art. 26(5)(b).

The New York Convention is a multilateral international treaty among 170 nations—including Spain, the Netherlands, and the United States—that governs "the recognition and enforcement" of commercial arbitral awards "made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York Convention, art. I(1).  Parties to the Convention agree to "recognize" such awards "as binding and enforce them."  *Id.*, art. III.  Awards are thus immediately enforceable in any country that is a party to the Convention, and can be set aside only "by a competent authority of the country in which, or under the law of which, th[e] award was made."  *Id.*, art. V(1)(e).  Enforcement in other nations' courts is subject only to the limited defenses specified in Article V of the Convention, which largely resemble the defenses to enforcement of a domestic arbitration award under the FAA.  *Mgmt. & Tech. Consultants S.A. v. Parsons-Jurden Int'l Corp.*, 820 F.2d 1531, 1534 (9th Cir. 1987).  The ECT's incorporation of the New York Convention thus ensures that ECT awards are widely and expeditiously enforceable.

## III.  The Arbitral Tribunal Rejects Spain's Objections To Intra-EU Arbitration And Awards Claimants Relief

In 2011, Claimants and other investors initiated arbitration against Spain under the UNCITRAL Rules, alleging that Spain violated the ECT through its legislative actions that diminished the returns on their investments.  JA84, 166-67, 346.

Over the ensuing eight years, an arbitral tribunal seated in Switzerland (the "Tribunal") considered and rejected all of Spain's objections to the Tribunal's jurisdiction, and awarded relief to Claimants.

**A.**    Before the Tribunal, Spain argued that the Tribunal could not exercise jurisdiction over an "intra-EU" dispute between an EU member state and EU-based investors. JA378-79. Such disputes, Spain argued, are governed by EU law, rather than the ECT, and accordingly must be resolved "within the judicial system of the EU," rather than by an international arbitral tribunal. JA378-89.

Spain's argument draws support from two decisions of the Court of Justice of the European Union ("CJEU")—the highest judicial authority among EU member states. In Case No. C-284/16, *Slovak Republic v. Achmea BV*, ECLI:EU:C:2018:158 (Mar. 6, 2018), bit.ly/42gP0l9 ("*Achmea*"), the CJEU held that an arbitration provision in a bilateral investment treaty between two EU member states was incompatible with EU law because it could lead to the resolution of EU law outside the EU judicial system, contravening the Treaty on the Functioning of the European Union ("TFEU") and the Treaty of European Union (collectively, the "EU Treaties"). *Id.* ¶¶ 43-55, 60. Then in Case No. C-741/19, *Republic of Moldova v. Komstroy LLC*, ECLI:EU:C:2021:655 (Sept. 2, 2021), bit.ly/3MJaiSn ("*Komstroy*"), the CJEU stated that *Achmea* applies to intra-EU arbitration under the ECT as well. *Id.* ¶¶ 51-52.

Spain repeatedly raised its intra-EU objection to the Tribunal's jurisdiction, and the Tribunal, acting in line with every other tribunal seated outside the EU to consider Spain's argument, repeatedly rejected it.  JA182-84, 351-52, 589.  In its jurisdictional decision, the Tribunal found "no indication in the text of the [ECT] that the Contracting Parties have limited their consent to arbitration on the basis that some" are EU members.  JA391.  The Tribunal also determined that the EU Treaties could not "override the investor-state mechanism explicitly agreed to by the EU member states and the EU itself."  JA394-95.  Although Swiss law allowed Spain to appeal this decision to the Swiss courts, Spain did not.  JA458.

**B.**    On the merits, the Tribunal found that Spain breached its obligations under the ECT to accord fair and equitable treatment to Claimants' investments by depriving them of a reasonable rate of return on the investments.  JA192-93, 222, 285-86, 303.  The Tribunal therefore directed Spain to pay them 26.5 million Euros in damages, plus interest.  JA303-04.

## IV.   Spain Seeks To Evade Enforcement Of The Award

Upon its rendering, the Award was due in full, fully enforceable in the courts of each signatory state to the New York Convention, and subject to set-aside proceedings only at the seat of the arbitration—in the Federal Supreme Court of Switzerland.  New York Convention, arts. III, V(1)(e).  The Swiss court, however, dis-

10

missed Spain's set-aside application in February 2021, holding that Spain had for-
feited its intra-EU objection by failing to timely appeal the Tribunal's jurisdictional
ruling.  JA458-60.

When Spain still refused to pay, Claimants commenced this action to recog-
nize and enforce the Award under the New York Convention and its implementing
legislation, Chapter 2 of the FAA, 9 U.S.C. §§ 201-208.  Spain moved to dismiss,
challenging the district court's subject-matter jurisdiction under the FSIA.  It argued
that the FSIA's arbitration exception did not apply because EU law rendered Spain's
agreement in the ECT to arbitrate with EU-based investors "void *ab initio*."  Dkt.
15-1 at 16-19.  And Spain urged that its accession to the New York Convention could
not be construed as an implied waiver of immunity from this action because the New
York Convention requires a valid agreement to arbitrate.  *Id.* at 19-22.

After the district court heard oral argument on Spain's motion to dismiss,
Spain launched a series of escalating actions in the Netherlands aimed at stripping
the district court of jurisdiction.  Those actions include proceedings in the District
Court of Amsterdam seeking:  (1) an *anti*-suit injunction blocking Claimants from
proceeding with this action in the district court; and (2) an *anti-anti-anti*-suit injunc-
tion barring Claimants from attempting to block the *anti*-suit injunction request by
seeking an *anti-anti*-suit injunction in U.S. court.   *See* JA725-59, 771.

11

Claimants thereafter each irrevocably and unconditionally assigned all of their rights, interests, and benefits in the Award to Blasket—a Delaware entity seemingly beyond the jurisdictional reach of the Dutch courts.  Dkt. 31-1 Exs. A-B; JA7-8. Claimants and Blasket then jointly moved to substitute Blasket.  The district court granted that motion on March 7, 2023.  JA8.

Yet Spain continues to press for relief in Dutch courts notwithstanding the assignment and substitution.  Spain's *anti-anti-anti*-suit injunction request also sought to enjoin Blasket.  JA766-67.  And Spain responded to Claimants' and Blasket's substitution motion by seeking emergency relief in the Dutch court to enjoin Claimants from seeking substitution.  JA782.  Although both of those requests for relief were denied, Spain's original *anti*-suit injunction proceeding remains pending in the Dutch court, and Spain has asked that court to add Blasket as a party to that action "to prevent" Blasket "from enforcing [the Award] in the United States." JA802, 804-05.

On March 15, 2023, therefore, Blasket moved for an anti-anti-suit injunction prohibiting Spain from pursuing its anti-suit injunction requests in Dutch courts.  As Blasket explained, because the Dutch action's "sole purpose" is "to terminate" Blasket's suit in U.S. court, and because Spain was blatantly seeking to evade the important public policies in favor of recognizing and enforcing awards under the New York Convention, a foreign anti-anti-suit injunction was justified under *Laker*

*Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984). Dkt. 40-1 at 16-22.

## V.    The District Court's Ruling And This Appeal

On March 29, 2023, the district court granted Spain's motion to dismiss for lack of subject-matter jurisdiction under the FSIA, JA834, and denied as moot Blasket's preliminary injunction motion, JA852 n.9.

The court held that it lacked subject matter jurisdiction under both the FSIA's arbitration exception, which confers jurisdiction over arbitration enforcement actions against foreign states, 28 U.S.C. § 1605(a)(6)(B), and the FSIA's waiver exception, which confers jurisdiction where a foreign state has waived its immunity from suit, *id.* § 1605(a)(1). The court held that both exceptions required the court to determine *de novo* whether Spain had validly consented to arbitrate, rather than deferring to the Tribunal's resolution of that issue. JA841-44, 850-51. Departing from the Tribunal's ruling, the court then held that "no valid agreement to arbitrate existed" between Spain and Claimants because EU law "invalidat[ed]" Spain's consent in the ECT to arbitrate intra-EU disputes. JA844-45.

To reach this conclusion, the court "interpret[ed]" the ECT's arbitration clause as providing for arbitration only subject to any "'rules and principles' derived from the EU treaties," including *Komstroy*'s bar on intra-EU arbitration. JA845-46. In reaching this "interpretation" of the ECT, the district court deemed it appropriate to

13

"'defer'" to certain EU members' own interpretations of the ECT as not applying to intra-EU disputes.  JA847-50.  The court acknowledged Blasket's "strongest counterargument": Under settled principles of international treaty interpretation, a "'subsequent interpretation'" of a treaty by less than all parties to a treaty warrants no weight because treaty members cannot unilaterally alter the treaty's meaning through a purported interpretation.  But the district court offered no answer to the point.  JA849 n.7.

## SUMMARY OF ARGUMENT

**I.**     The district court erred in dismissing this action for lack of subject-matter jurisdiction based on Spain's collateral attack on the Tribunal's determination that Spain consented to arbitrate in the ECT.  The FSIA's arbitration and waiver exceptions, 28 U.S.C. § 1605(a)(6), (1), each independently create jurisdiction over this action.

**A.**     The arbitration exception broadly grants jurisdiction over arbitration enforcement actions against foreign states under the New York Convention.  While the plaintiff must identify the arbitration agreement—here, Article 26 of the ECT—the scope and validity of that agreement is not a jurisdictional issue under FSIA.  Regardless, Spain delegated disputes about its consent to arbitrate to the Tribunal when it joined the ECT because the ECT incorporates arbitral rules—the UNCITRAL Rules—that provide for the Tribunal to decide such arbitrability disputes.

The district court thus was required to defer to the Tribunal's determination that Spain validly consented to arbitration.

Even if the arbitration exception permitted Spain to relitigate *de novo* the Tribunal's jurisdictional holding, the Tribunal was correct that Spain consented to arbitration. As expert arbitration tribunals have consistently recognized, Spain's EU-law objection to arbitrating intra-EU disputes has no bearing on Spain's consent to arbitrate under the ECT because: (1) the ECT's arbitration provision unambiguously provides for intra-EU arbitration; and (2) under well-settled principles of international treaty law, the EU's internal laws do not and cannot supersede Spain's clear commitment to arbitration under a multilateral treaty like the ECT that includes non-EU members.

**B.** The waiver exception independently creates jurisdiction because Spain implicitly waived immunity from suits under the New York Convention when it joined that Convention. In doing so, Spain must have contemplated enforcement actions in other signatory states, including the United States. This Court has repeatedly recognized that that is sufficient to establish an implicit waiver of immunity.

**II.** Reversing the district court's jurisdictional holdings requires reversing the district court's decision denying Blasket's preliminary injunction motion as moot. But the Court should go further. The same considerations that warranted an injunction in *NextEra* and *9REN* equally warranted an injunction here to prevent

Spain from using the Dutch courts to block these U.S. proceedings.  The Court

should thus instruct the district court to grant Blasket's request for an injunction.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of Spain's motion to dis-

miss.  *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 774

(D.C. Cir. 2022) ("*P&ID*").  The Court reviews the denial of Blasket's preliminary

injunction motion for abuse of discretion, but reviews the "'underlying legal conclu-

sions'" *de novo*.  *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir.

2009).

## ARGUMENT

## I.    The District Court Erred By Dismissing For Lack Of Subject-Matter Jurisdiction Under The Foreign Sovereign Immunities Act

In dismissing this action for lack of subject-matter jurisdiction under the

FSIA, the district court erred twice over.  First, it misread the FSIA's arbitration and

waiver exceptions to permit Spain to do what the New York Convention forbids:  to

collaterally attack the Tribunal's determinations on an issue the parties agreed to

arbitrate.  Second, it misjudged the merits of that collateral attack, wrongly conclud-

ing—against the Tribunal's holding and the clear weight of international authority—

that Spain's intra-EU objection deprived the ECT's arbitration clause of force.

The New York Convention mandates that the United States, as a Contracting

State, "shall recognize arbitral awards as binding and enforce them in accordance

16

with the rules of procedure of the territory where the award is relied upon." New York Convention, art. III. Under Chapter 2 of the FAA, which implements the Convention, an enforcing court "shall" confirm the award unless one of the Convention's limited grounds for refusing enforcement applies. 9 U.S.C. § 207. Those grounds largely "trac[k]" those in the FAA, *Mgmt. & Tech. Consultants*, 820 F.2d at 1534, and courts applying them give the findings and conclusions of arbitrators the same "'considerable deference'" as under the FAA, *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016).

Given those "limited grounds," *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 160 n.15 (2d Cir. 2021), federal courts have "little discretion in refusing or deferring enforcement of foreign arbitral awards," *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012). The party opposing confirmation thus bears a "substantial" burden in opposing confirmation and enforcement of an award under the New York Convention. *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 836 (9th Cir. 2010).

The district court held that, notwithstanding the New York Convention's mandate to courts to enforce arbitral awards, it lacked subject-matter jurisdiction under the FSIA. The FSIA grants federal courts subject-matter jurisdiction over an action against a foreign state if one of the FSIA's enumerated exceptions from a foreign state's sovereign immunity applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355

(1993); 28 U.S.C. § 1330(a).  Two such exceptions—the arbitration exception, 28 U.S.C. § 1605(a)(6), and the waiver exception, *id.* § 1605(a)(1)—apply here.

## A.    The District Court Has Jurisdiction Under The FSIA's Arbitration Exception

The district court had jurisdiction under the FSIA's arbitration exception. That exception permits a proceeding against a foreign state "to confirm an award made pursuant to … an agreement" by the foreign state, "with or for the benefit of a private party," to "submit to arbitration." 28 U.S.C. § 1605(a)(6).  Jurisdiction exists if the "award is … governed by a treaty"—such as the New York Convention—that is "in force for the United States" and that "call[s] for the recognition and enforcement of arbitral awards." *Id.*  This case easily satisfies those requirements, without regard to Spain's intra-EU objection.  But even if Spain's objection were cognizable, it lacks merit.

### 1.    Spain Cannot Relitigate The Tribunals' Jurisdiction Under The Arbitration Exception

The arbitration exception applies when three "jurisdictional facts" are "established":  (1) "the existence of an arbitration agreement"; (2) "an arbitration award"; and (3) "a treaty governing the award," such as the "New York Convention." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 & n.2 (D.C. Cir. 2021).  Spain concedes that this proceeding is "governed by" the New York Convention.  28 U.S.C. § 1605(a)(6); *see* JA839.

In *Chevron Corp. v. Ecuador*, this Court established a burden-shifting frame-work for the two remaining elements. A plaintiff meets its initial "burden of pro-duction" by producing the defendant's agreement to arbitrate, the "notice of arbitra-tion," and "the tribunal's arbitration decision." 795 F.3d 200, 204 (D.C. Cir. 2015). In an investment dispute, the relevant agreement is the applicable investment treaty. *See id.* (relying on Ecuador's bilateral investment treaty with the United States). A separate agreement "with" the plaintiff is not required because an agreement made "for the benefit of a private party" suffices. 28 U.S.C. § 1605(a)(6). Claimants thus met their initial burden by submitting the ECT, Dkt. 1-3, the arbitration notice, Dkt. 20-2 Ex. D, and the Award, JA20-333.

The "burden" then "shift[s]" to the foreign state to "rebu[t] the presumption that the [treaty] and … notice of arbitration constituted an agreement to arbitrate." *Chevron*, 795 F.3d at 205. But the grounds for doing so are narrow: Challenges to "the arbitrability of a dispute" under the treaty are "not … jurisdictional question[s]," *Stileks*, 985 F.3d at 878, so if the state "does not dispute the existence of the [treaty], [the] notice, or the tribunal's arbitration decision," the jurisdictional inquiry is at an end. *Chevron*, 795 F.3d at 204-05. Because Spain does not dispute that the ECT exists, that Claimants noticed an arbitration, and that the Tribunal issued an Award, the district court had jurisdiction under the arbitration exception.

Despite these clear principles, the court found subject-matter jurisdiction lacking, concluding that Spain's intra-EU objection meant that there was no "valid agreement to arbitrate." JA834. But whether Spain validly agreed in the ECT to arbitrate this particular dispute (or this intra-EU type of dispute) is not a jurisdictional issue, and even if it were, the Tribunal's determination of that issue would be binding because the parties expressly delegated that question to the Tribunal.

a.     By its express terms, the FSIA's arbitration exception requires only an "award" and an "agreement to arbitrate," 28 U.S.C. § 1605(a)(6)—not a "valid award" or "valid agreement to arbitrate." Nothing in the provision's text contemplates a threshold jurisdictional determination as to the merits of the award or arbitration agreement. This Court should "resist reading words or elements into [the] statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997).

As the United States recently explained as a court-invited *amicus curiae* in *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 27 F.4th 771 (D.C. Cir. 2022) ("*P&ID*"), these issues are not jurisdictional because, on its face, the arbitration exception "ties jurisdiction to the *goal* of the suit, not to its likelihood of success." U.S. *Amicus* Br., *P&ID*, 2022 WL 190972, at *7-8 (D.C. Cir. Jan. 20, 2022) (emphasis added). "It requires an 'action … brought … to confirm an award,'" not "a threshold jurisdictional determination that the award is confirmable." *Id.* at *8-9 (quoting 28 U.S.C. § 1605(a)(6)).

20

To conclude otherwise "would … be in tension with the enforcement scheme established by the New York Convention and [its] implementing legislation," which sets forth grounds on which "a court '*may*'—not 'must'—refuse to recognize or enforce an award."  U.S. *Amicus* Br., *P&ID*, 2022 WL 190972, at *9 (quoting New York Convention, art. V(1)); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 367 n.43 (5th Cir. 2003) (Article V "makes refusal to enforce discretionary" *even* when an enumerated defense applies).  The New York Convention is the paradigmatic "'treaty Congress intended to include in the arbitration exception,'" *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123-24 (D.C. Cir. 1999), so the exception should be interpreted "to avoid … conflicts" with that "treat[y]," *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 724 F.3d 230, 233-34 (D.C. Cir. 2013) ("*OOIDA*").

This Court agreed with the government's position in *P&ID*, holding that "the validity or enforceability of an arbitral award is a merits question," which forms no "part of [the district court's] jurisdictional inquiry."  27 F.4th at 776.  The Court thus held that jurisdiction under the arbitration exception was "straightforward" even though the award there had been set aside by the Federal High Court of Nigeria and a "criminal investigation" had begun into "evidence of fraud in the arbitration and underlying contract negotiations."  *Id.* at 773, 776.

21

While *P&ID* involved a challenge to the validity of an arbitral award, its reasoning applies equally to challenges to the validity of an arbitration agreement. As with an award, the "valid[ity]" of an arbitration agreement is a merits issue under the New York Convention, and thus a discretionary ("may")—not mandatory (must)—ground for opposing enforcement. New York Convention, art. V(1), (1)(a). Congress could not have intended for courts to decide that issue twice—as a matter of both jurisdiction and the merits—or to make an agreement's invalidity a mandatory bar to jurisdiction when the Convention makes it a discretionary ground for refusing enforcement. Instead, all the arbitration exception requires for subject-matter jurisdiction is an award "made pursuant to … an agreement to arbitrate." 28 U.S.C. § 1605(a)(6). And here, the Award expressly invokes the ECT's arbitration provision as the basis for its jurisdiction. JA368-69.

*Chevron* and *Stileks* confirm the point. In *Chevron*, Ecuador contended that it "never agreed to arbitrate with Chevron"—and the district court thus lacked subject-matter jurisdiction over an enforcement action under the FSIA's arbitration exception—because the investments at issue were not covered by the relevant treaty's arbitration clause. 795 F.3d at 202-03. This Court rejected that effort to recast that objection as a jurisdictional challenge, holding the argument was "properly considered … under the New York Convention" standard—not "*de novo*," which would "conflat[e] … jurisdictio[n]" with the merits. *Id.* at 205-06. At the jurisdictional

phase, the Court deferred to the arbitral tribunal's determination that Ecuador "consent[ed] to arbitration" in a "valid agreement." *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 64, 67 (D.D.C. 2013); 795 F.3d at 205 n.3 (citing 949 F. Supp. 2d at 63 and quoting language appearing at 67).

So too in *Stileks*, which involved the same ECT arbitral award, issued under the UNCITRAL Rules, that the CJEU addressed in *Komstroy*—the case (along with *Achmea*) on which Spain chiefly relies for its intra-EU objection. Like Spain does here, Moldova challenged subject-matter jurisdiction under the arbitration exception by contending that it had never "agreed to arbitrate th[e] particular dispute" decided in the award. 985 F.3d at 878 (emphasis omitted). This Court waved that objection aside, underscoring that "the arbitrability of a dispute is not a jurisdictional question under the FSIA." *Id.*

Until the decision below, district courts had consistently applied *Chevron* and *Stileks* to decline to reconsider at the jurisdictional stage a wide range of challenges to a foreign state's consent to arbitration, including: (1) Pakistan's argument that its investment treaty conditioned arbitration on a separate written consent that it never provided, *Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*, 590 F. Supp. 3d 262, 273-74 (D.D.C. 2022); (2) Nigeria's argument that it never entered any agreement with one of the plaintiffs because he was not a signatory to the arbitration agreement, *Chiejina v. Fed. Republic of Nigeria*, 2022 WL 3646377, at *4 (D.D.C.

Aug. 24, 2022); and (3) the same intra-EU objection Spain raises here, *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 2023 WL 2016932, at *4-7 (D.D.C. Feb. 15, 2023); *9REN Holding S.À.R.L. v. Kingdom of Spain*, 2023 WL 2016933, at *3-6 (D.D.C. Feb. 15, 2023); *Cube Infrastructure Fund SICAV v. Kingdom of Spain*, 2023 WL 2914472, at *7-11 (D.D.C. Mar. 31, 2023).  Though this Court has suggested that a showing by a state that there is no "valid arbitration agreement" could defeat jurisdiction under the arbitration exception, *Chevron*, 795 F.3d at 205, courts have consistently—and correctly—rejected the "tactic" of using an arbitrability dispute to "'bolster [a] claim of sovereign immunity' under FSIA," *Tethyan*, 590 F. Supp. 3d at 274.  Such claims "implicate only the merits of the petition, rather than the court's jurisdiction."  *Chiejina*, 2022 WL 3646377, at *5.

**b.**    Even assuming arbitrability were relevant for jurisdiction under the FSIA, moreover, the district court erred in analyzing the validity of the arbitration agreement *de novo*.  The Tribunal's determination that the parties agreed to arbitrate the dispute is binding because the parties agreed to arbitrate any dispute over whether their ECT dispute was arbitrable.

It is well settled that "parties may agree to have an arbitrator decide … 'gateway questions of arbitrability,'" including "'whether the parties have agreed to arbitrate.'"  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).  That is because arbitration is "a matter of contract between the parties," and parties

can contract to arbitrate the arbitrability of their dispute just as they can contract to arbitrate the merits of their dispute. *First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). When parties agree to delegate questions of arbitrability to an arbitral tribunal, they in effect create two distinct, "severable" agreements: one to arbitrate their dispute (the "arbitration agreement") and a second to arbitrate the validity and effect of that arbitration agreement (the "delegation provision"). *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-72 (2010). Courts find delegation provisions effective when there is "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013) (cleaned up).

When the parties agree to arbitrate arbitrability, "the court's standard for reviewing the arbitrator's decision about *that* matter"—*i.e.*, arbitrability—"should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate." *First Options*, 514 U.S. at 943. That review is exceptionally narrow. When a question of arbitrability has been delegated to the arbitral tribunal, the court "possesses *no power* to decide the arbitrability issue," and the arbitral tribunal's decision is binding even if it is "wholly groundless." *Henry Schein*, 139 S. Ct. at 529 (emphasis added).

Spain and Blasket clearly and unmistakably agreed to arbitrate the question whether Spain agreed to arbitrate the merits of their dispute. This Court has "held

that the requisite clear and unmistakable delegation occurs when the parties' agreement incorporates arbitral rules that in turn assign questions of arbitrability to the arbitrator." *Comm'ns Workers of Am. v. AT&T Inc.*, 6 F.4th 1344, 1347 (D.C. Cir. 2021). And in *Stileks*, this Court squarely held that the ECT's arbitration provisions clearly and unmistakably delegate arbitrability questions to the arbitrators by incorporating the UNCITRAL Rules, which "state that the 'arbitral tribunal shall have the power to rule on its own jurisdiction.'" 985 F.3d at 878-79 (citing ECT, art. 26(4)(b) and quoting UNCITRAL Rules, art. 23(1)). In ratifying the ECT, Spain thus delegated to the Tribunal the power to rule on any objection to its jurisdiction, including "objections with respect to the existence or validity of the arbitration clause." UNCITRAL Rules, art. 23(1). And while Spain has challenged whether the investment dispute here is subject to arbitration under the ECT, it has never challenged the delegation of that question to the Tribunal under the UNCITRAL Rules. This Court must therefore "treat" that delegation agreement "as valid." *Rent-A-Center*, 561 U.S. at 72.

Here, far from objecting to the Tribunal's determination of Spain's objection, Spain affirmatively asked the Tribunal to do so, JA620-36, forcing Claimants through almost two years of arbitration on that issue alone, JA40. Having "voluntarily and unreservedly submit[ted] [that] issue to arbitration," Spain "cannot [now] argue that the arbitrator[s] had no authority to resolve it," and thereby gain a second

bite at the same apple. *Jones Dairy Farm v. Loc. No. P-1236, United Food & Com. Workers Int'l Union, AFL-CIO*, 760 F.2d 173, 175 (7th Cir. 1985). Since the parties agreed to arbitrate the Tribunal's jurisdiction, that determination is binding. *Stileks*, 985 F.3d at 879 ("*Henry Schein* means that we must accept the arbitral tribunal's determination that [petitioner's] claim fell within the ECT."). Thus, even if arbitrability did somehow concern the court's jurisdiction under the FSIA, the Tribunal's finding that Spain agreed to arbitrate this dispute is controlling.

**c.**    The district court nonetheless concluded that it could review Spain's intra-EU objection from scratch. In the district court's view, *Chevron* and *Stileks* held only that "questions about the 'scope of arbitrability'" could be delegated to the arbitral tribunal, but questions whether a party was "*incapable* of entering into an agreement to arbitrate" may not be delegated. JA843-44. That conclusion is flawed in several respects.

*First*, the district court misapprehended the nature of Spain's intra-EU objection as implicating the *existence* of an agreement to arbitrate rather than the *scope* of that agreement. Spain does not dispute the "existence" of the ECT's provisions, nor that Spain is a "party to the ECT," nor that the ECT's arbitration provisions apply to investment disputes between Spain and investors from non-EU states, such as Japan. *Stileks*, 985 F.3d at 877 & n.3. Spain's objection thus necessarily is to the *scope* of its consent to arbitrate.

That is why Spain's leading case—Case No. C-741/19, *Republic of Moldova v. Komstroy LLC*, ECLI:EU:C:2021:655 (Sept. 2, 2021)—did not purport to hold that EU member states *cannot* agree to arbitrate at all, but instead stated only that the ECT "must be interpreted" not to apply to intra-EU disputes. *Id*. ¶¶ 39, 66, 85. Both Spain and the European Commission as *amicus curiae* have likewise described the intra-EU objection as bearing on "interpretation of the ECT." Dkt. 15-1, at 18; *accord* Dkt. 19, at 3 (The "ECT must be interpreted as not applying" intra-EU.). And despite characterizing the dispute as one of "capacity" for purposes of distinguishing *Chevron* and *Stileks*, JA840, the district court ultimately resolved Spain's intra-EU objection through principles of "interpretation" of the ECT, not through any superseding principle of international law that would render the ECT ineffective as to its properly interpreted scope, JA845.

*Second*, questions of "scope" and questions of capacity both are questions of "arbitrability" that may be delegated to an arbitral tribunal. *See Oxford Health Plans*, 569 U.S. at 569 n.2 ("'question[s] of arbitrability' … 'include … whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy'"); *Henry Schein*, 139 S. Ct. at 529 ("[P]arties may agree to have an arbitrator decide … 'whether the parties have agreed to arbitrate.'"). The three cases the district court cited on the issue, JA842—*Johansson v. Central Properties, LLC*, 320 F. Supp. 3d 218 (D.D.C. 2018);

*RDP Technologies, Inc. v. Cambi AS*, 800 F. Supp. 2d 127 (D.D.C. 2011); and *Amir-motazedi v. Viacom, Inc.*, 768 F. Supp. 2d 256 (D.D.C. 2011)—are not to the contrary; none involved a delegation of arbitrability issues to an arbitrator.

*Chevron* and *Stileks* illustrate why any purported distinction in this context between scope and validity is illusory. Although the district court suggested that both cases "resolved questions about the 'scope of arbitrability,'" JA843, the parties in those cases in fact challenged the *formation* of any arbitration agreement. The dispute in *Chevron* concerned the scope of Ecuador's "standing *offer*" to arbitrate, but Ecuador tied the scope of that *offer* to the *existence* of an agreement to arbitrate: If the dispute fell outside of the offer, Ecuador argued, no agreement was ever formed, and thus "Ecuador *never agreed to arbitrate* with Chevron." 795 F.3d at 205-06 (emphasis added). And in *Stileks*, Moldova likewise contended that it never "agreed to arbitrate" the dispute because it did not concern an "investment" covered by the ECT. 985 F.3d at 878. *Chevron* and *Stileks* thus illustrate that scope and validity are two sides of the same coin—an arbitration agreement is valid only as to the parties and issues within its scope.

Here, the UNCITRAL Rules provide for arbitrators to decide any "objections with respect to the existence or validity of the arbitration clause." UNCITRAL Rules, art. 23(1). Spain indisputably entered into the ECT, agreed to the application

of the UNCITRAL Rules, and affirmatively invoked the Tribunal's authority to de-
cide Spain's objection that the ECT does not apply to intra-EU disputes. Whether
Spain's contention is framed as one of the scope, validity, or existence of an arbitra-
tion agreement, it was delegated to the Tribunal to decide. Under *Stileks*, the district
court "'possesse[d] no power'" to revisit the issue; it was required to "accept the
arbitral tribunal's determination" that Spain validly agreed to arbitrate this dispute.
985 F.3d at 878-79.

## 2. The Tribunal's Determination That Spain Consented To Arbitration Was Correct

Should it reach the merits of Spain's collateral attack on the Tribunal's con-
clusion that Spain validly consented to arbitrate, this Court should reverse the district
court. The Tribunal was correct: Spain undeniably consented to arbitration, and
irrespective of EU law, its consent was valid under international law.

The district court's contrary international-law analysis departed from the con-
sensus view of tribunals outside of the EU, including the decisions of nearly 50 tri-
bunals. *BayWa r.e. AG v. Kingdom of Spain*, No. 1:22-cv-2403, Dkt. 21 ¶ 165,
App'x (D.D.C. Jan. 30, 2023). These tribunals include many of the world's leading
experts on international law, most operating under the auspices of the World Bank's
International Center for Settlement of Investment Disputes ("ICSID"). *Id.*; JA679
& n.85. Every three-member tribunal includes one member selected by each side,
who jointly select the third member. *E.g.*, UNCITRAL Rules, art. 9; Convention on

30

the Settlement of Investment Disputes between States and Nationals of Other States ("ICSID Convention"), art. 37(2)(b). Yet these tribunals have rejected the intra-EU objection every time but one.[1] And just last week, a court in the United Kingdom did the same, holding that "[t]he EU treaties do not trump" Spain's "pre-existing treaty obligations under ... the ECT." *Infrastructure Servs. Luxembourg S.À.R.L. v. Kingdom of Spain*, [2023] EWHC 1226 (Comm) ¶ 67, bit.ly/45wjoL2.

The district court's international-law analysis is an extreme outlier and it is incorrect. The ECT unambiguously provides for intra-EU arbitration, and under settled principles of international law, EU law cannot override Spain's consent to arbitrate.

### a.     The ECT Unambiguously Authorizes Intra-EU Arbitration

The district court held that the "ECT" should be "interpret[ed]" as not applying to disputes arising between an EU investor and an EU member state. JA844-45. That is incorrect.

---

[1] The sole outlier—*Green Power Partners K/S & SCE SolarDon Benito APS v. Kingdom of Spain*, SCC Arbitration V (2016/135) (June 16, 2022), bit.ly/3N4SrXA—arose from an arbitral tribunal seated in Sweden, an EU member state. The tribunal held that because the "seat of the arbitration" was "an EU Member State," it was bound to apply "EU law." *BayWa*, No. 1:22-cv-2403, Dkt. 21 ¶ 165 & n.125. But neither the Tribunal here, which was seated in Switzerland, nor courts in the United States are bound by the CJEU's rulings.

**i.**    "International treaties are contracts between nations, and interpretation of a treaty is 'a matter of determining the parties' intent.'" JA845.  Courts thus look to "'the text of the treaty and the context in which the written words are used.'" JA845 (quoting *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991)).  Courts also "refer to the Vienna Convention on the Law of Treaties [("Vienna Convention")], which the United States has signed but not ratified."  JA845 n.5 (citing *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013)).  Though the district court correctly identified these guiding principles, JA845, it failed to apply them.

Spain does not contest the Tribunal's holding that on its face, the ECT's arbitration provision, Article 26(1), applies to intra-EU disputes.  JA399-400.  That provision expresses each Contracting Party's consent to arbitrate all "[d]isputes between a Contracting Party and an Investor of another Contracting Party."  ECT, art. 26(1). Spain is undeniably a "Contracting Party," *id.*, art. 1(2), and Claimants are undeniably "Investors of" the Netherlands—"another Contracting Party"—because they are "organized in accordance with the law applicable in" the Netherlands, *id.*, arts. 1(2), (7), 26(1).

Had the ECT's drafters nonetheless intended to exempt intra-EU disputes, they could have done so through a "disconnection clause"—a provision in a multilateral treaty that clarifies that some parties to the treaty will apply separate rules amongst themselves.  JA655-56.  The EU members were "well aware" of these

32

clauses when they "enter[ed] into the ECT," having previously included such clauses in several treaties. *Vattenfall AB v. Fed. Republic of Germany*, ICSID Case No. ARB/12/12, Decision on *Achmea* Issue ¶ 203 (Aug. 31, 2018), bit.ly/3Kqecxo; UN Int'l Law Comm'n Rep't on Fragmentation of Int'l Law ¶ 289 & n.394 (Apr. 13, 2006), bit.ly/3IikAVj. The ECT itself, for example, included a disconnection clause that disapplied the ECT to matters governed by the Svalbard Treaty. *Vattenfall*, *supra*, ¶ 204 & n.123.

Instead, the ECT's drafters explicitly *rejected* a proposal by the European Commission to add a disconnection provision requiring "[EU] Contracting Parties" to "apply Community rules" and "not" the ECT to intra-EU disputes. *See* Draft Treaty, Basic Agreement for the European Energy Charter, at 84 (Aug. 12, 1992), bit.ly/3ia5E0Z; JA656. There were good reasons for that choice. The ECT sought to ensure "uniformity of treatment of investors, regardless of their country of origin," to avoid the possibility that one state might arbitrarily favor awarding contracts to investors from states to whom it owes no international law obligations. JA664. The "intentiona[l] omi[ssion]" of this proposed language from the ECT thus confirms the ECT's drafters' conscious choice to subject intra-EU disputes to the ECT's arbitration agreement. *Vattenfall*, *supra*, ¶ 206. And since the EU and all of its member states signed the ECT, the EU itself undeniably acquiesced in this dispute resolution regime.

And thus for the ECT's first decade, its application to intra-EU disputes was universally assumed. Early scholarship on the ECT echoed this assumption. JA658. So did EU members, at least initially. In 2010, for example, the Netherlands—Claimants' home country—observed during an intra-EU arbitration that EU law "'cannot and d[id] not affect'" the tribunal's jurisdiction. JA658-59. Indeed, until the Lisbon Treaty took effect in 2009, expanding the EU's scope, EU law was broadly understood not even to address the areas covered by the ECT. JA661. It was only in the late 2000s—*after* Claimants made their investments in Spain in reliance on the ECT—that EU members faced with potential liability under the ECT and other investment treaties first surfaced an objection to intra-EU arbitration. That belated objection thus has no grounding in the ECT's text or context.

**ii.** Denying none of this, the district court interpreted the ECT's choice-of-law provision, Article 26(6), as carving out an unwritten, implicit exception to its arbitration clause. Article 26(6) directs arbitral tribunals to "decide the issues in dispute in accordance with [the ECT] and applicable rules and principles of international law." The district court read that provision as subordinating the ECT to "any other 'rules and principles of international law' that apply to a dispute between the parties" in any context—including, here, the EU Treaties, which form the basis for EU law and for Spain's intra-EU objection. JA846. The court cited no authority for this novel interpretation of Article 26(6), and it lacks merit.

34

To start, Article 26(6) is not a blanket directive or grant of authority to ECT tribunals to apply any international treaty that may exist between the parties. Parties to the ECT consent to arbitrate disputes "under" the ECT, ECT, art. 26(1), not under other, unrelated treaties. International treaties thus apply only to the extent "applicable" to the "issues in dispute" under the ECT specifically, *id.*, art. 26(6). For example, tribunals apply the Vienna Convention because it governs interpretation of the ECT. *E.g.*, JA110, 357. As another ECT tribunal recognized, "it does not follow" that simply because EU law "is rooted in international treaties, … all of EU law is international law for all purposes, or that it will necessarily be the applicable law in all circumstances." *Hydro Energy 1 S.á.r.l v. Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum ¶ 502(16) (Mar. 9, 2020), bit.ly/3IxnAAn.

Even if EU law were "applicable," moreover, Article 26(6) does not subordinate the ECT's provisions to other "applicable" international rules. It places them on equal footing. Tribunals must decide the dispute "in accordance with" *both* the ECT ("this Treaty") and "applicable … international law." ECT, art. 26(6). Acting in "accordance" with the ECT, *id.*, in turn requires allowing arbitrations to proceed if they fit within the plain text of the ECT's arbitration clause. Avoiding a conflict with that requirement is further reason to conclude that other, incompatible international treaties cannot be considered "applicable" law under the ECT. But even if

35

they could be, they would not automatically trump the ECT.  Instead, the conflict would have to be resolved under principles of treaty interpretation—an analysis that favors intra-EU arbitration, *see infra* at 37-43, but that the district court never performed.

To conclude otherwise would allow an end run around the requirements for amending the ECT.  Amendments are effective only when approved by "three-fourths of the Contracting Parties."  ECT, art. 42(4).  But under the district court's interpretation, any two parties could modify the ECT as between themselves—undercutting the goal of uniformity—simply by entering a conflicting bilateral treaty just between them.  Indeed, the EU could unilaterally reinstate the disconnection clause that the ECT's drafters deliberately left on the cutting room floor.

**iii.**     As the principal support for its reading of Article 26(6), the district court purported to "'defer'" to several purported "subsequent interpretation[s]" of the ECT by certain EU "signatories" to the ECT.  JA847.  But courts "defer" to subsequent treaty interpretations only when "the parties to a treaty both"—or all— "agree" on its meaning.  *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982).  The views of the EU and its members (as parties to the ECT) are not entitled to any weight when it comes to interpreting the international obligations imposed by the ECT on its contracting parties, because only collective action by all parties to a treaty—for example, an "agreement between the parties regarding … interpretation"

36

or an instrument made by one party and "accepted by the other parties"—can modify its plain meaning and effect. Vienna Convention, art. 31(2)(b), (3)(a); JA667-69. One party to a treaty cannot use "interpretation" to unilaterally modify a treaty without complying with the requirements for amending, modifying, or withdrawing from the treaty under the treaty's own terms, *e.g.*, ECT, arts. 42, 47, or international law, *e.g.*, Vienna Convention, art. 41.

The district court acknowledged that these concerns about unilateral modifications were the "strongest counterargument" to its view, but it offered no response. JA849 n.7 ("Unfortunately for petitioners, this argument."). There is no basis to "interpret" the ECT to exclude intra-EU arbitration.

### b.    The EU Treaties Cannot Deprive The ECT Of Force Under International Law

Nothing in EU law affects Spain's consent to arbitration in the ECT. As a sovereign nation, Spain had full capacity under international law to enter into the ECT irrespective of any incompatibility with the EU Treaties. And well-established principles of treaty interpretation resolve any incompatibility in favor of enforcing Spain's agreement to arbitrate.

**i.**    Two central tenets of treaty law are that every sovereign state "possesses capacity to conclude treaties," and that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." Vienna Convention, arts. 6, 26. This is true regardless of the state's evolving views of the validity of its

own prior commitments:  A state may neither "invoke the provisions of its internal law as justification for its failure to perform a treaty," nor "invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent." *Id.*, arts. 27, 46(1); *see* JA677-78.  This rule ensures the "stability of treaty relations" by preventing states from "seek[ing] to avoid [their] treaty obligations by invoking decisions by [their] courts or other constructions of [their] domestic law."  Restatement (Fourth) of Foreign Relations Law: Treaties, Tentative Draft No. 2 § 102, Reporter's Note 6 (Mar. 20, 2017).

These principles are familiar to U.S. courts.  U.S. treaties "'may comprise international commitments'" and impose "international law obligations" on the United States even if they never come into effect as "'domestic law'" and are not "enforceable in United States courts."  *Medellin v. Texas*, 552 U.S. 491, 504-05 (2008); *cf. Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 160 (1934) ("international obligation [would] remai[n] unaffected" by repeal of statute implementing treaty).  As a result, consistent with the Vienna Convention, a treaty signed by the President "create[s] a binding international obligation" that "remain[s]" in effect "even if [a domestic court] … declare[s] [the treaty] unconstitutional for purposes of domestic law."  *Made in the USA Found. v. United States*, 242 F.3d 1300, 1310 n.23 (11th Cir. 2001) (citing Vienna Convention, arts.

38

26, 46).  Similarly, a foreign country's treaty with the United States "remains in force under principles of international law" even if that country's courts "declar[e] [the treaty] unconstitutional" so the treaty "is not domestically binding" in that country.  *United States v. Martinez*, 755 F. Supp. 1031, 1032-33 (N.D. Ga. 1991) (citing Vienna Convention, arts. 27, 46).  Articles 27 and 46 of the Vienna Convention apply these same principles to all treaties.

These principles defeat Spain's effort to invoke the EU's internal law to invalidate its own international-law commitments under the ECT.  EU law, as interpreted by the CJEU, is *internally* binding within the EU in specific ways.  The courts of EU member states must accept the CJEU's interpretation of the EU's founding treaties.  *See* TFEU, art. 267.  And if EU members breach their EU-law obligations, the European Commission may "bring the matter before the [CJEU]." *Id*., art. 258.  But neither of these principles allows the CJEU to invalidate the EU's or its members' international law obligations.  JA639, 674-75.  EU law operates on "an internal … plane" within the EU legal system, but *outside* of EU tribunals its effect is qualified by the Vienna Convention rule that a State "may not invoke … internal law regarding competence to conclude treaties" as a means "to invalidate a treaty" already concluded.  *Blusun S.A. v. Italian Republic*, ICSID Case No. ARB/14/3, Award, ¶ 283 (Dec. 27, 2016), bit.ly/3waaYKc; JA639, 674-76.

**ii.**      Rather than raising an issue of "capacity," as the district court suggested, JA840, the Vienna Convention treats conflicts between "successive treaties" on the "same subject" as an issue of treaty interpretation.  Vienna Convention, art. 30.  Under the applicable interpretation principles, the ECT's arbitration agreement supersedes any contrary provision of EU law.

The ECT expressly provides that its dispute resolution provisions supersede other treaties that are less protective of investors' rights.  Under the heading "Relation to Other Agreements," Article 16 specifies precisely how the ECT should apply when a "prior" or "subsequent" treaty addresses the same "subject matter" as the ECT's dispute resolution provisions. ECT, art. 16(2).  If the ECT's provisions are "more favourable to the Investor" than the other treaty, the ECT controls, and the other treaty may not "be construed to derogate from" the investors' rights under the ECT, including "any right to dispute resolution." *Id.*  International law gives Article 16 force through the principle of *lex specialis*, which recognizes that a more specific treaty takes precedence over one that speaks in more general terms, JA673—echoing the familiar "principle of statutory construction that a specific statute … controls over a general provision," *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981).  As a matter of international law, therefore, the EU Treaties cannot be construed to "der-

ogate from an Investor's right to dispute resolution" under the ECT, *Vattenfall*, *supra*, ¶ 195; JA671-72, particularly given the ECT drafters' deliberate decision to omit a disconnection clause subordinating the ECT to EU law, *see supra* at 33.

Even absent Article 16, moreover, the result would be the same under the rule of *lex posteriori*, which recognizes that where two treaties are at issue, "the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty." Vienna Convention, art. 30(3); JA673. In a "conflict between two treaties," "the more recent … controls." *OOIDA*, 724 F.3d at 233. Here, the more recent is the ECT. The ECT came into force in 1998, while the EU Treaty provisions underlying Spain's intra-EU objection—Articles 267 and 344 of the TFEU, *see*, *e.g.*, *Komstroy*, *supra*, ¶¶ 53-79—have been in place, materially unchanged, since the European Economic Community was formed in 1957. *Compare, e.g.*, Treaty Establishing the European Economic Community, arts. 177, 219, bit.ly/3xie8Mq, *with* TFEU, arts. 267, 344. The ECT's adoption thus superseded those provisions to the extent of any conflict. JA673.

Rather than apply the above-discussed principles, however, the district court invoked the EU-law principle of "primacy." But that principle merely governs EU law's relative superiority to EU members' "national"—*i.e.*, domestic—laws, "not international law." *Hydro Energy*, *supra*, ¶ 502(17); JA674-75. It is thus a principle

41

*internal* to EU law, governing on its own plane, but in no way affecting legal relations among non-EU members.

The district court's contrary suggestion that primacy also governs the EU Treaties' relationship to other "international agreements," JA847, lacks merit. EU law does not exempt EU members from conflicting treaty obligations. In *Matthews v. United Kingdom*, for example, the European Court of Human Rights held that the United Kingdom could not defend against human rights violations by arguing that EU law compelled them. 28 Eur. Ct. H.R. 361 (Feb. 18, 1999), ¶¶ 35, 41-44, bit.ly/3MSCbbX. The court's own authorities describe "primacy" as governing EU law's relationship to "the law of Member States," not international law. JA566 (Lisbon Treaty Declaration). And in any event, primacy is merely a concept internal to EU law. Even if the CJEU had held that the EU Treaties supersede contrary treaties under EU law, that would not make it so under international law. *See Infrastructure Servs.*, *supra*, ¶ 87 ("If intra-EU arbitration is contrary to EU law principles governing either primacy of the CJEU or EU principles generally, ... [t]hat conflict does not mean that the latter EU law principles as enunciated by the CJEU remove Spain from the ambit and scope of the ECT.").

Accordingly, should the Court reach the merits of Spain's intra-EU objection, it should join the consensus of international tribunals in rejecting it. The Court

should thus find Spain's consent to arbitration valid and should reverse on that basis the district court's dismissal for lack of subject-matter jurisdiction.

## B.  The District Court Has Jurisdiction Under The FSIA's Waiver Exception

The district court also independently has subject-matter jurisdiction under the FSIA's waiver exception, which provides that a foreign state is subject to jurisdiction in any case in which it "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).  Because the New York Convention expressly contemplates enforcement of foreign arbitral awards against signatory states in the courts of other signatories, including the United States, Spain's signing of the Convention necessarily waived its immunity from such enforcement suits in U.S. courts.  And because that waiver is based on Spain's consent to enforcement in the New York Convention, jurisdiction in no way depends on whether Spain consented to arbitration in the ECT.

1.    This case involves a waiver "by implication."  28 U.S.C. § 1605(a)(1). To waive immunity by implication, a state need only "'indicat[e] its amenability to suit'" in U.S. court, *Creighton*, 181 F.3d at 122, by either:  (a) showing "a subjective intent to waive immunity"; (b) "tak[ing] an act that objectively can be interpreted as exhibiting an intent to waive immunity"; or (c) "tak[ing] acts that forfeit its right to immunity, irrespective of whether it has intended to do so," *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 202 (2d Cir. 1999); *see Creighton*, 181 F.3d at 122-23 ("follow[ing] the Second Circuit" in "construing the implied waiver provision").

43

Under these principles, when a foreign state joins a treaty that "contemplate[s] arbitration-enforcement actions in other signatory countries, including the United States"—as the New York Convention plainly does, *see supra* at 8—it "waives its immunity from arbitration-enforcement actions" under the FSIA. *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam). This Court held this view of the implied waiver exception to be "correc[t]" in *Creighton*, 181 F.3d at 123. And in *Tatneft*, this Court applied *Creighton* to hold that Ukraine waived its immunity to enforcement of arbitral awards under the New York Convention "by signing [that] Convention," because signatories to the Convention "agree to enforce arbitral awards made in other signatory countries" and necessarily "anticipat[e] being subjected to enforcement" in those countries. 771 F. App'x at 9-10.

The Second Circuit has applied the same rule to find waivers under the New York Convention, *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578-79 (2d Cir. 1993), and other arbitration enforcement conventions, *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013) (ICSID Convention). And district courts in this Circuit have taken that same approach in numerous cases. *E.g.*, *ConocoPhillips Petrozuata B.V. v. Bolivarian Republic of Venezuela*, 2022 WL 3576193, at *4 (D.D.C. Aug. 19, 2022); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 190 (D.D.C. 2016).

44

These precedents are well supported.  The New York Convention is of a piece with other long-recognized implicit waivers of FSIA immunity because it combines a forum-selection provision with a choice-of-law provision.   Parties to the Convention agree that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon" and the substantive standards set forth by the Convention itself, New York Convention, art. III, which the United States has codified, 9 U.S.C. §§ 201-208.

Such "agreements about forum selection" and "choice of law" are "traditional examples of implied waiver."  *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 178 (D.D.C. 2006).  Even a "non-exclusive forum selection clause" providing for suit in U.S. court is sufficient to "waive … sovereign immunity."  *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1302, 1309 n.13 (11th Cir. 2008).  And the FSIA's legislative history expressly contemplates waiver where "a foreign state has agreed that the law of a particular country should govern."  H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.  The FSIA has been "consistently interpreted as retaining this basis for implied waiver."  *Ashraf-Hassan v. Embassy of France in U.S.*, 40 F. Supp. 3d 94, 100 (D.D.C. 2014) (collecting cases), *aff'd*, 610 F. App'x 3 (D.C. Cir. 2015).

45

Here, Spain both agreed that it was appropriate to enforce arbitral awards in the courts of "[e]ach Contracting State," and agreed to the procedural and substantive standards to be applied in those courts. Subjecting Spain to a forum and legal standards it intentionally selected in no way impinges on its sovereignty. To the contrary, *withholding* jurisdiction would impinge on Spain's sovereignty by "disrespect[ing] [its] choice … to be a Contracting State" to the New York Convention—and would thereby "diminish other Nations' ability to attract investment in the future by committing themselves to resolving investment disputes through arbitration." *ConocoPhillips*, 2022 WL 3576193, at *4.

**2.** The district court dismissed these principles, holding that even if a "'foreign sovereign is a party to the New York Convention,'" "the existence of an agreement to arbitrate" is a "prerequisite" to establishing intent to waive immunity. JA850-51. That is incorrect. The waiver occurs "'when [the] country becomes a signatory to the Convention,'" *Creighton*, 181 F.3d at 123—"by becoming a party," *Blue Ridge*, 735 F.3d at 84—not later, by signing an arbitration agreement (such as the ECT). *Creighton* observed that it was *not* the fact that a foreign sovereign "agreed … to arbitrate" that was relevant, but rather that "the defendant sovereign was … a signatory to the Convention." 181 F.3d at 123. And *Tatneft* held that Ukraine waived immunity without even mentioning, much less rejecting, Ukraine's assertion that it "did not agree to arbitrate th[e] dispute" at issue—and that "[n]o

46

agreement to arbitrate" the claims of two of the petitioners involved was ever "formed," Br. for Appellant, *Tatneft*, 2018 WL 4215736, at *43, *46 (D.C. Cir. Sept. 4, 2018) (cleaned up). That consideration made no difference to the Court's jurisdictional analysis under the waiver exception.

Neither of the cases the district court cited for its arbitration agreement prerequisite support that requirement. *Creighton* merely cited the FSIA's "'legislative history'" to show that waivers of immunity must be "intentiona[l]" because the "'examples of implied waiver'" mentioned by Congress all "'arise either from the foreign state's agreement … or from its filing a responsive pleading.'" 181 F.3d at 123. Spain's "agreement" to join the New York Convention meets that requirement. *Id*. *P&ID*, meanwhile, merely characterized *Tatneft*, in *dicta*, as "holding that the waiver exception applies if the foreign sovereign is a party to the New York Convention and has agreed to arbitrate in a Convention state." 27 F.4th at 774. That description of *Tatneft* was imprecise; the agreement to arbitrate in *Tatneft* was disputed and this Court did not rely on it in finding waiver. *See supra* at 46-47. In any event, *P&ID* did not hold that an arbitration agreement was required. It expressly declined to "wade into" the waiver exception and instead affirmed jurisdiction under the arbitration exception. 27 F.4th at 774-76 & n.3.

**3.** Even if some form of arbitration agreement were required, moreover, the ultimate validity of that agreement would not bear on Spain's waiver. Instead,

it is enough that Spain "entered into a contract"—the ECT—"that had a provision that any disputes would be submitted to arbitration, and then participated in an arbitration in which an award was issued against it." *Seetransport*, 989 F.2d at 578-79. When Spain signed the ECT, it necessarily believed it was valid and that it applied to intra-EU disputes. *See supra* at 32-34. So it must have "contemplated" and thus assented to "the involvement of the courts of any of the Contracting States" to the New York Convention in enforcing ECT awards, *Seetransport*, 989 F.2d at 578-79. While Spain now, decades after its accession to the ECT, denies its capacity to consent to arbitration, it nowhere denies its capacity to waive its immunity.

And that waiver, once made, is binding, and applies "notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1). Having committed itself to global enforcement to "'induc[e]'" international investment and reaped the rewards, Spain cannot "'go back on its promise'" now that "'a dispute [has] arise[n].'" *Ashraf-Hassan*, 40 F. Supp. 3d at 101 (quoting H.R. Rep. No. 94-1487, at 18, 1976 U.S.C.C.A.N. at 6617).

## II.    Blasket Is Entitled To An Anti-Anti-Suit Injunction

The district court also erred in denying an anti-anti-suit injunction to stop Spain's illegitimate assault on the court's jurisdiction. The court denied the motion solely on the basis that it "lack[ed] jurisdiction over petitioners' case." JA852 n.9.

Because that premise is wrong, *see supra* at 16-48, the denial of the motion for injunctive relief must be vacated.

Rather than merely remanding, however, this Court should order the district court to enter the requested injunction. *E.g.*, *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 512 (D.C. Cir. 2016) (reversing denial of relief and "remand[ing] for the district court to enter a preliminary injunction"). An anti-anti-suit injunction is warranted here for the same reasons that Judge Chutkan cited in granting identical relief in *NextEra*, 2023 WL 2016932, at \*8-14, and *9REN*, 2023 WL 2016933, at \*7-13. Spain's flimsy counterarguments, Dkt. 42, fail here for the same reasons as in those cases.

As explained in the district court, Dkt. 40-1, Spain's Dutch action here poses the exact same threat to the district court's jurisdiction that Judge Chutkan correctly found to warrant relief in *NextEra* and *9REN* because its "sole purpose" is "to terminate" pre-existing proceedings in the United States. *Laker Airways*, 731 F.2d at 930. Blasket still faces the same threat that NextEra and 9REN confronted: Spain has asked the Dutch court to order Blasket to withdraw this case—which Spain named specifically by case number and court—and "take all actions necessary to suspend the proceedings currently pending," "on pain of forfeiting a penalty sum of EUR 30,000 per day," and to withdraw the petition. JA756-57, 804-05. The stated "purpose" of Spain's Dutch lawsuit "is to prevent" Blasket "from enforcing [the

49

Award] in the United States." JA802, 804-05. That threat makes an anti-anti-suit injunction "necessary to protect the jurisdiction" of the district court. *Laker Airways*, 731 F.2d at 927.

Spain has also shown its willingness to seek even more aggressive relief, and the Dutch courts may grant such relief on short notice. In addition to its main lawsuit in the Netherlands, Spain filed a separate, *ex parte* application in the Dutch court attempting to block Blasket and Claimants from filing an anti-anti-suit injunction motion. JA792. The very next day—and without hearing from the defendants—the Dutch court issued a temporary restraining order barring Blasket and Claimants from moving for anti-anti-suit relief in the United States. JA760-68. That order persisted for nearly two weeks, until Blasket and Claimants could appear before the court and persuade it to deny Spain's request for a preliminary injunction. JA792-93. Spain also attempted to block Claimants from substituting Blasket as petitioner. JA782-83. Spain even went after Claimants' directors personally, naming them as defendants in its request to block the motion for substitution and threatening them with criminal and monetary penalties if they did not comply with its demands. JA770-73, 775-78, 819. Absent a preliminary injunction, therefore, it is clear that Spain will leave no stone unturned in the Dutch courts in seeking to stop this action to enforce an indisputably final arbitral award.

Anti-anti-suit relief is also warranted because Spain has sought to upend "important public policies of" the United States, *Laker Airways*, 731 F.2d at 927—namely, "the emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). "[T]hat federal policy applies with special force in the field of international commerce" in cases covered by the New York Convention, since when Congress and the Executive undertook the obligations in the Convention, they made clear their "strong belief in the efficacy of arbitral procedures for the resolution of international commercial disputes." *Id.* To tolerate Spain's "attemp[t] to use the law and courts of a third country" to "frustrate" this action—especially when the Dutch action "is not a proceeding contemplated by the [New York] Convention"—would directly undermine the elected branches' preference for streamlined and expedient recognition and enforcement of New York Convention awards. *Laker Airways*, 731 F.2d at 954 n.175; *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 127 (2d Cir. 2007).

If this Court affirms in *NextEra* and *9REN*, as it should, there is no basis to treat this case differently; all the relevant facts and issues are the same. And because "only one conclusion would be supportable" on remand, *Donovan ex rel. Anderson v. Stafford Constr. Co.*, 732 F.2d 954, 961 (D.C. Cir. 1984), further proceedings on Blasket's motion would only delay the inevitable, *see Caribbean Broad. Sys., Ltd.*

*v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1085 (D.C. Cir. 1998) (reversing rather than vacating and remanding to avoid "a waste of judicial resources").  In the meantime, that would leave Blasket vulnerable to renewed attempts by Spain to extinguish this action and expose it to irreparable harm.  *See* Dkt. 40-1 at 22-31.  The Court should therefore reverse the denial of Blasket's motion for a preliminary anti-anti-suit injunction and instruct the district court to grant Blasket its requested relief.

## CONCLUSION

The Court should reverse the district court's order and remand with instructions to enter an anti-anti-suit injunction against Spain.

Dated:  August 10, 2023

/s/ *Matthew D. McGill*

Matthew D. McGill
Matthew S. Rozen
Jeffrey Liu
Lavi M. Ben Dor*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3680
MMcGill@gibsondunn.com

*Attorneys for Blasket Renewable Investments, LLC*

* Admitted only in New York and Pennsylvania; practicing under the supervision of principals of the firm.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2023, I served a copy of the foregoing brief on all counsel of record via this Court's CM/ECF system.


Dated:  August 10, 2023

*/s/ Matthew D. McGill*

Matthew D. McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3680
MMcGill@gibsondunn.com

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,096 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.    This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point, Times New Roman font.

Dated:  August 10, 2023                /s/ Matthew D. McGill
                                                     Matthew D. McGill
                                                     GIBSON, DUNN & CRUTCHER LLP
                                                     1050 Connecticut Avenue, N.W.
                                                     Washington, D.C.  20036
                                                     (202) 887-3680
                                                     MMcGill@gibsondunn.com

54

# ADDENDUM OF AUTHORITIES

# ADDENDUM OF AUTHORITIES[1]

Addendum Page

9 U.S.C. § 201................................................................................3a

9 U.S.C. § 207................................................................................3a

28 U.S.C. § 1291............................................................................4a

28 U.S.C. § 1330............................................................................4a

28 U.S.C. § 1605............................................................................5a

Energy Charter Treaty Article 1 ...................................................12a

Energy Charter Treaty Article 2 ...................................................16a

Energy Charter Treaty Article 10 .................................................17a

Energy Charter Treaty Article 16 .................................................20a

Energy Charter Treaty Article 26 .................................................21a

Energy Charter Treaty Article 40 .................................................24a

Energy Charter Treaty Article 42 .................................................25a

Energy Charter Treaty Article 47 .................................................26a

ICSID Convention Article 37 .......................................................27a

New York Convention Article I.....................................................28a

New York Convention Article III ..................................................28a

---

[1]  Pursuant to D.C. Circuit Rule 28, this addendum includes all pertinent statutes and regulations; it also includes all pertinent treaty provisions.  For ease of reference, the footnotes of the Energy Charter Treaty provisions, which solely contain citations, and on which Appellant does not rely, have been omitted.

New York Convention Article V ....................................................................29a

Treaty on the Functioning of the European Union Article 258 ............................30a

Treaty on the Functioning of the European Union Article 267 ............................30a

Treaty on the Functioning of the European Union Article 344 ............................31a

UNCITRAL Rules Article 9 ....................................................................32a

UNCITRAL Rules Article 23 ....................................................................33a

Vienna Convention Article 6 ....................................................................34a

Vienna Convention Article 26 ....................................................................34a

Vienna Convention Article 27 ....................................................................34a

Vienna Convention Article 30 ....................................................................35a

Vienna Convention Article 31 ....................................................................36a

Vienna Convention Article 32 ....................................................................37a

Vienna Convention Article 41 ....................................................................38a

Vienna Convention Article 46 ....................................................................39a

**9 U.S.C. § 201.   Enforcement of Convention**

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.

**9 U.S.C. § 207.   Award of arbitrators; confirmation; jurisdiction; proceeding**

Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

## 28 U.S.C. § 1291.   Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. § 1330.   Actions against foreign states

**(a)** The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

**(b)** Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

**(c)** For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

**28 U.S.C. § 1605.  General exceptions to the jurisdictional immunity of a foreign state**

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> **(1)** in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

> **(2)** in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

> **(3)** in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

> **(4)** in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

> **(5)** not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

> > **(A)** any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

**(B)** any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

**(6)** in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

**(b)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: Provided, That—

**(1)** notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

**(2)** notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

**(c)** Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

**(d)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

**[(e), (f)** Repealed. Pub. L. 110–181, div. A, title X, § 1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341.]

**(g) Limitation on Discovery.—**

    **(1) In general.—**

        **(A)** Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A or section 1605B, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

**(B)** A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

**(2) Sunset.—**

**(A)** Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

**(B)** After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would—

**(i)** create a serious threat of death or serious bodily injury to any person;

**(ii)** adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

**(iii)** obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

**(3) Evaluation of evidence.—**
The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

**(4) Bar on motions to dismiss.—**
A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

**(5) Construction.—**
Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

**(h) Jurisdictional Immunity for Certain Art Exhibition Activities.—**

**(1) In general.—**If—

**(A)** a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

**(B)** the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)), that such work is of cultural significance and the temporary exhibition or display of such work is in the national interest; and

**(C)** the notice thereof has been published in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)),
any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

**(2) Exceptions.—**

**(A) Nazi-era claims.—**Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and—

**(i)** the property at issue is the work described in paragraph (1);

**(ii)** the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

**(iii)** the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

**(iv)** a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(B) Other culturally significant works.—**In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and—

**(i)** the property at issue is the work described in paragraph (1);

**(ii)** the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

**(iii)** the taking occurred after 1900;

**(iv)** the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

**(v)** a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(3) Definitions.—**For purposes of this subsection—

**(A)** the term "work" means a work of art or other object of cultural significance;

**(B)** the term "covered government" means—

**(i)** the Government of Germany during the covered period;

**(ii)** any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

**(iii)** any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

**(iv)** any government in Europe that was an ally of the Government of Germany during the covered period; and

**(C)** the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.

**Energy Charter Treaty Article 1.   Definitions**

As used in this Treaty:

**(1)** "Charter" means the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991; signature of the Concluding Document is considered to be signature of the Charter.

**(2)** "Contracting Party" means a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force.

**(3)** "Regional Economic Integration Organization" means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.

**(4)** "Energy Materials and Products", based on the Harmonized System of the Customs Co-operation Council and the Combined Nomenclature of the European Communities, means the items included in Annex EM.

**(5)** "Economic Activity in the Energy Sector" means an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale of Energy Materials and Products except those included in Annex NI, or concerning the distribution of heat to multiple premises.

**(6)** "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

> **(a)** tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

> **(b)** a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

**(c)** claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

**(d)** Intellectual Property;

**(e)** Returns;

**(f)** any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.

"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.

**(7)** "Investor" means:

    **(a)** with respect to a Contracting Party:

        **(i)** a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

        **(ii)** a company or other organization organized in accordance with the law applicable in that Contracting Party;

    **(b)** with respect to a "third state", a natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph (a) for a Contracting Party.

13a

**(8)** "Make Investments" or "Making of Investments" means establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity.

**(9)** "Returns" means the amounts derived from or associated with an Investment, irrespective of the form in which they are paid, including profits, dividends, interest, capital gains, royalty payments, management, technical assistance or other fees and payments in kind.

**(10)** "Area" means with respect to a state that is a Contracting Party:

**(a)** the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and

**(b)** subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.

With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization.

**(11)**

**(a)** "GATT" means "GATT 1947" or "GATT 1994", or both of them where both are applicable.

**(b)** "GATT 1947" means the General Agreement on Tariffs and Trade, dated 30 October 1947, annexed to the Final Act Adopted at the Conclusion of the Second Session of the Preparatory Committee of the United Nations Conference on Trade and Employment, as subsequently rectified, amended or modified.

**(c)** "GATT 1994" means the General Agreement on Tariffs and Trade as specified in Annex 1A of the Agreement Establishing the World Trade Organization, as subsequently rectified, amended or modified.

A party to the Agreement Establishing the World Trade Organization is considered to be a party to GATT 1994.

**(d)** "Related Instruments" means, as appropriate:

**(i)** agreements, arrangements or other legal instruments, including decisions, declarations and understandings, concluded under the auspices of GATT 1947 as subsequently rectified, amended or modified; or

**(ii)** the Agreement Establishing the World Trade Organization including its Annex 1 (except GATT 1994), its Annexes 2, 3 and 4, and the decisions, declarations and understandings related thereto, as subsequently rectified, amended or modified.

**(12)** "Intellectual Property" includes copyrights and related rights, trademarks, geographical indications, industrial designs, patents, layout designs of integrated circuits and the protection of undisclosed information.

**(13)**

**(a)** "Energy Charter Protocol" or "Protocol" means a treaty, the negotiation of which is authorized and the text of which is adopted by the Charter Conference, which is entered into by two or more Contracting Parties in order to complement, supplement, extend or amplify the provisions of this Treaty with respect to any specific sector or category of activity within the scope of this Treaty, or to areas of co-operation pursuant to Title III of the Charter.

**(b)** "Energy Charter Declaration" or "Declaration" means a non-binding instrument, the negotiation of which is authorized and the text of which is approved by the Charter Conference, which is entered into by two or more Contracting Parties to complement or supplement the provisions of this Treaty.

**(14)** "Freely Convertible Currency" means a currency which is widely traded in international foreign exchange markets and widely used in international transactions.

**Energy Charter Treaty Article 2.   Purpose of the Treaty**

This Treaty establishes a legal framework in order to promote long-term co-opera-tion in the energy field, based on complementarities and mutual benefits, in accord-ance with the objectives and principles of the Charter.

**Energy Charter Treaty Article 10.   Promotion, Protection and Treatment of Investments**

**(1)** Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.  Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.  Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

**(2)** Each Contracting Party shall endeavour to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3).

**(3)** For the purposes of this Article, "Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable.

**(4)** A supplementary treaty shall, subject to conditions to be laid down therein, oblige each party thereto to accord to Investors of other parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3).  That treaty shall be open for signature by the states and Regional Economic Integration Organizations which have signed or acceded to this Treaty.  Negotiations towards the supplementary treaty shall commence not later than 1 January 1995, with a view to concluding it by 1 January 1998.

**(5)** Each Contracting Party shall, as regards the Making of Investments in its Area, endeavour to:

> **(a)** limit to the minimum the exceptions to the Treatment described in paragraph (3);

**(b)** progressively remove existing restrictions affecting Investors of other Contracting Parties.

**(6)**

**(a)** A Contracting Party may, as regards the Making of Investments in its Area, at any time declare voluntarily to the Charter Conference, through the Secretariat, its intention not to introduce new exceptions to the Treatment described in paragraph (3).

**(b)** A Contracting Party may, furthermore, at any time make a voluntary commitment to accord to Investors of other Contracting Parties, as regards the Making of Investments in some or all Economic Activities in the Energy Sector in its Area, the Treatment described in paragraph (3). Such commitments shall be notified to the Secretariat and listed in Annex VC and shall be binding under this Treaty.

**(7)** Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable.

**(8)** The modalities of application of paragraph (7) in relation to programmes under which a Contracting Party provides grants or other financial assistance, or enters into contracts, for energy technology research and development, shall be reserved for the supplementary treaty described in paragraph (4). Each Contracting Party shall through the Secretariat keep the Charter Conference informed of the modalities it applies to the programmes described in this paragraph.

**(9)** Each state or Regional Economic Integration Organization which signs or accedes to this Treaty shall, on the date it signs the Treaty or deposits its instrument of accession, submit to the Secretariat a report summarizing all laws, regulations or other measures relevant to:

**(a)** exceptions to paragraph (2); or

**(b)** the programmes referred to in paragraph (8).

A Contracting Party shall keep its report up to date by promptly submitting amendments to the Secretariat. The Charter Conference shall review these reports periodically.

In respect of subparagraph (a) the report may designate parts of the energy sector in which a Contracting Party accords to Investors of other Contracting Parties the Treatment described in paragraph (3).

In respect of subparagraph (b) the review by the Charter Conference may consider the effects of such programmes on competition and Investments.

**(10)** Notwithstanding any other provision of this Article, the treatment described in paragraphs (3) and (7) shall not apply to the protection of Intellectual Property; instead, the treatment shall be as specified in the corresponding provisions of the applicable international agreements for the protection of Intellectual Property rights to which the respective Contracting Parties are parties.

**(11)** For the purposes of Article 26, the application by a Contracting Party of a trade-related investment measure as described in Article 5(1) and (2) to an Investment of an Investor of another Contracting Party existing at the time of such application shall, subject to Article 5(3) and (4), be considered a breach of an obligation of the former Contracting Party under this Part.

**(12)** Each Contracting Party shall ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorizations.

**Energy Charter Treaty Article 16.   Relation to Other Agreements**

Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,

**(1)** nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

**(2)** nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.

**Energy Charter Treaty Article 26.   Settlement of Disputes Between an Investor and a Contracting Party**

**(1)** Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

**(2)** If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

> **(a)** to the courts or administrative tribunals of the Contracting Party party to the dispute;

> **(b)** in accordance with any applicable, previously agreed dispute settlement procedure; or

> **(c)** in accordance with the following paragraphs of this Article.

**(3)**

> **(a)** Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

> **(b)**

>> **(i)** The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

>> **(ii)** For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

**(c)** A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).

**(4)** In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

**(a)**

**(i)** The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or

**(ii)** The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;

**(b)** a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or

**(c)** an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

**(5)**

**(a)** The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules;

(ii) an "agreement in writing" for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and

(iii) "the parties to a contract [to] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules.

(b) Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

(7) An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".

(8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

**Energy Charter Treaty Article 40.   Application to Territories**

**(1)** Any state or Regional Economic Integration Organization may at the time of signature, ratification, acceptance, approval or accession, by a declaration deposited with the Depository, declare that the Treaty shall be binding upon it with respect to all the territories for the international relations of which it is responsible, or to one or more of them.  Such declaration shall take effect at the time the Treaty enters into force for that Contracting Party.

**(2)** Any Contracting Party may at a later date, by a declaration deposited with the Depository, bind itself under this Treaty with respect to other territory specified in the declaration.  In respect of such territory the Treaty shall enter into force on the ninetieth day following the receipt by the Depository of such declaration.

**(3)** Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification to the Depository.  The withdrawal shall, subject to the applicability of Article 47(3), become effective upon the expiry of one year after the date of receipt of such notification by the Depository.

**(4)** The definition of "Area" in Article 1(10) shall be construed having regard to any declaration deposited under this Article.

**Energy Charter Treaty Article 42.   Amendments**

**(1)** Any Contracting Party may propose amendments to this Treaty.

**(2)** The text of any proposed amendment to this Treaty shall be communicated to the Contracting Parties by the Secretariat at least three months before the date on which it is proposed for adoption by the Charter Conference.

**(3)** Amendments to this Treaty, texts of which have been adopted by the Charter Conference, shall be communicated by the Secretariat to the Depository which shall submit them to all Contracting Parties for ratification, acceptance or approval.

**(4)** Instruments of ratification, acceptance or approval of amendments to this Treaty shall be deposited with the Depository.  Amendments shall enter into force between Contracting Parties having ratified, accepted or approved them on the ninetieth day after deposit with the Depository of instruments of ratification, acceptance or approval by at least three-fourths of the Contracting Parties.  Thereafter the amendments shall enter into force for any other Contracting Party on the ninetieth day after that Contracting Party deposits its instrument of ratification, acceptance or approval of the amendments.

**Energy Charter Treaty Article 47.   Withdrawal**

**(1)** At any time after five years from the date on which this Treaty has entered into force for a Contracting Party, that Contracting Party may give written notification to the Depository of its withdrawal from the Treaty.

**(2)** Any such withdrawal shall take effect upon the expiry of one year after the date of the receipt of the notification by the Depository, or on such later date as may be specified in the notification of withdrawal.

**(3)** The provisions of this Treaty shall continue to apply to Investments made in the Area of a Contracting Party by Investors of other Contracting Parties or in the Area of other Contracting Parties by Investors of that Contracting Party as of the date when that Contracting Party's withdrawal from the Treaty takes effect for a period of 20 years from such date.

**(4)** All Protocols to which a Contracting Party is party shall cease to be in force for that Contracting Party on the effective date of its withdrawal from this Treaty.

**ICSID Convention Article 37**

**(1)** The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36.

**(2)**

> **(a)** The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators appointed as the parties shall agree.
>
> **(b)** Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties.

**New York Convention Article I**

**1.** This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

**2.** The term "arbitral awards" shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted.

**3.** When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

**New York Convention Article III**

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

**New York Convention Article V**

**1.** Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

    **(a)** The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

    **(b)** The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

    **(c)** The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

    **(d)** The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

    **(e)** The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

**2.** Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

    **(a)** The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
    **(b)** The recognition or enforcement of the award would be contrary to the public policy of that country.

**Treaty on the Functioning of the European Union Article 258**

If the Commission considers that a Member State has failed to fulfil an obligation under the Treaties, it shall deliver a reasoned opinion on the matter after giving the State concerned the opportunity to submit its observations. If the State concerned does not comply with the opinion within the period laid down by the Commission, the latter may bring the matter before the Court of Justice of the European Union.

**Treaty on the Functioning of the European Union Article 267**

The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:

**(a)** the interpretation of the Treaties;

**(b)** the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;

Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay.

**Treaty on the Functioning of the European Union Article 344**

Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.

**UNCITRAL Rules Article 9**

**1.** If three arbitrators are to be appointed, each party shall appoint one arbitrator. The two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the arbitral tribunal.

**2.** If within 30 days after the receipt of a party's notification of the appointment of an arbitrator the other party has not notified the first party of the arbitrator it has appointed, the first party may request the appointing authority to appoint the second arbitrator.

**3**. If within 30 days after the appointment of the second arbitrator the two arbitrators have not agreed on the choice of the presiding arbitrator, the presiding arbitrator shall be appointed by the appointing authority in the same way as a sole arbitrator would be appointed under article 8.

**UNCITRAL Rules Article 23**

**1.** The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause that forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null shall not entail automatically the invalidity of the arbitration clause.

**2.** A plea that the arbitral tribunal does not have jurisdiction shall be raised no later than in the statement of defence or, with respect to a counterclaim or a claim for the purpose of a set-off, in the reply to the counterclaim or to the claim for the purpose of a set-off. A party is not precluded from raising such a plea by the fact that it has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

**3.** The arbitral tribunal may rule on a plea referred to in paragraph 2 either as a preliminary question or in an award on the merits. The arbitral tribunal may continue the arbitral proceedings and make an award, notwithstanding any pending challenge to its jurisdiction before a court.

**Vienna Convention Article 6.   Capacity of States to conclude treaties**

Every State possesses capacity to conclude treaties.

**Vienna Convention Article 26.   "Pacta sunt servanda"**

Every treaty in force is binding upon the parties to it and must be performed by them in good faith.

**Vienna Convention Article 27.   Internal law and observance of treaties**

A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. This rule is without prejudice to article 46.

**Vienna Convention Article 30.   Application of successive treaties relating to the same subject matter**

**1.** Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.

**2.** When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

**3.** When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.

**4.**  When the parties to the later treaty do not include all the parties to the earlier one:

>  **(a)** as between States Parties to both treaties the same rule applies as in paragraph 3;

>  **(b)** as between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

**5.** Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.

**Vienna Convention Article 31.   General rule of interpretation**

**1.** A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

**2.** The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

> **(a)** any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

> **(b)** any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

**3.** There shall be taken into account, together with the context:

> **(a)** any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

> **(b)** any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

> **(c)** any relevant rules of international law applicable in the relations between the parties.

**4.** A special meaning shall be given to a term if it is established that the parties so intended.

**Vienna Convention Article 32.   Supplementary means of interpretation**

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

**(a)** leaves the meaning ambiguous or obscure; or

**(b)** leads to a result which is manifestly absurd or unreasonable.

**Vienna Convention Article 41.   Agreements to modify multilateral treaties between certain of the parties only**

**1.** Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

> **(a)** the possibility of such a modification is provided for by the treaty; or

> **(b)** the modification in question is not prohibited by the treaty and:

>> **(i)** does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

>> **(ii)** does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

**2.** Unless in a case falling under paragraph 1 (a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

**Vienna Convention Article 46.    Provisions of internal law regarding competence to conclude treaties**

**1.** A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

**2.** A violation is manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith.